Filed 7/14/26  P. v. Peyton CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARTIN PEYTON,<br><br>    Defendant and Appellant. | B348723<br><br>(Los Angeles County<br>Super. Ct. No. 24PSCF00719) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ramiro P. Cisneros, Judge.  Affirmed.

Travis Daily, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Patricia Rosman, Deputy Attorneys General, for Defendant and Respondent.

————————————————

# INTRODUCTION

Martin Peyton appeals the denial of his motion for mental health diversion under Penal Code section 1001.36.[1]  Peyton argues the trial court abused its discretion by relying on the facts and circumstances of the charged offense and by disregarding the remedial purpose of the diversion statute when it denied diversion based, among other things, on its finding there was an unreasonable risk to public safety that Peyton would commit a super strike offense.  We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Offense and Information*

In November 2024, Peyton lived with his mother and his brother, Jacob F.  At approximately 3:20 a.m. on November 4, Peyton stabbed Jacob in the chest with a large kitchen knife after a brief physical altercation.  Peyton then ordered Jacob and his mother to leave the house.  Jacob sustained a deep laceration on his chest, additional lacerations to his armpit and thigh, and defensive wounds to his forearm.

Peyton was charged with the attempted murder of Jacob (§§ 187, subd. (a), 664), with special allegations that he personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury upon Jacob (§ 12022.7, subd. (a)).  The complaint also alleged Peyton was previously convicted of two serious or violent felony

---

[1]    Undesignated statutory references are to the Penal Code.

convictions under the Three Strikes law (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)), namely two burglary convictions from 2013 and 2017 (§ 459).

B.    *Peyton's Section 1001.36 Motion*

In March 2025, Peyton petitioned for mental health diversion under section 1001.36. The petition stated Peyton was "diagnosed by a mental health expert with Post Traumatic Stress Disorder, Substance Induced Psychotic Disorder, Hallucinogen Use Disorder and Cannabis Use Disorder." Peyton asserted that he met the statutory criteria for mental health treatment: he suffered from a qualifying mental health condition; the condition "played a significant role in the commission of the charged offense;" "[i]n the opinion of a qualified mental health expert, [he] would respond to mental health treatment;" he agreed to comply with treatment as a condition of diversion and waived his right to a speedy trial; and he did not "pose an unreasonable risk of danger to the community."

Accompanying Peyton's petition was a report from Dr. Sherif Toma, a clinical psychologist, who conducted a telephone evaluation with Peyton and reviewed his arrest report and treatment history.[2] Dr. Toma indicated that Peyton

---

[2]    Peyton's petition for diversion and Dr. Toma's report were not filed under seal in the trial court, and the record on appeal does not include a motion to seal or a sealing order as required by California Rules of Court, rule 8.46(b)(2). Moreover, Peyton's publicly available brief quotes and summarizes Dr. Toma's report extensively. Accordingly, we do not deem the report "a record sealed by order of the trial court" and determine we need not file a public version of this opinion that redacts references to the

3

exhibited posttraumatic stress disorder, substance-induced psychotic disorder, hallucinogen use disorder, and cannabis (marijuana) use disorder, and that these conditions were a significant factor in the charged offense. Peyton reported to Dr. Toma that he started experiencing psychotic symptoms in 2023, including hearing voices and experiencing visual hallucinations, paranoia, and delusions. He further reported starting to use marijuana at age 14 and he used it daily, including on the day of his arrest. Peyton also described frequently using mushrooms since 2021, including on the day before his arrest. Peyton also reported using fentanyl weekly since 2023 and using ecstasy and painkillers since age 15, but stated he did not use these substances on the day of his arrest.

Dr. Toma reviewed Peyton's medical records, including a previous incident where Peyton was psychiatrically hospitalized in July 2023 as a danger to himself and others. In that incident, Peyton had an argument with his mother when he slashed his own car tires and ran around with a machete. Peyton's mother stated that Peyton was bipolar and acted extremely aggressively. Peyton reported that he was seeing things and had superpowers. Peyton tested positive for marijuana use after this incident, and he reported behavioral changes, hallucinations, and paranoia among other symptoms. Peyton was prescribed mood stabilizers and antipsychotic medication and reported he was feeling better on the medication.

Following Peyton's arrest in November 2024, mental health evaluations in jail reported Peyton was likely mentally ill due to

contents of Dr. Toma's report. (Cal. Rules of Court, rule 8.46(b)(2), (g).)

paranoid and delusional thoughts, blunted affect, and suicidal ideation. Peyton denied having a history of mental illness that he could remember, although he admitted he might need medication. Peyton was prescribed an antipsychotic medication, but he requested the staff provide him an alternative medication a couple months later. It does not appear a change was made.

When Dr. Toma asked Peyton about the current charge, Peyton stated he was looking for fruit in the refrigerator and he was going to use a knife to cut the fruit, but his brother tried to grab the knife from his hand in a threatening way. Peyton stated he was hallucinating about why the fruit was not in season, he believed the city was on fire and demons were coming out of the woods, and he thought his brother was attacking him.

Dr. Toma opined that "Peyton's behavior is correlated to his untreated mental illness that was exacerbated by his drug use. During the interview, he reported experiencing symptoms that correlate to a diagnosis of bipolar disorder. He also mentioned using cannabis as well as mushrooms. . . . His psychotic symptoms, including paranoia, hallucinations, and disorganized thinking, appear to have been directly correlated with his cannabis use . . . [and] align[] with previous incidents where he exhibited similar symptoms after cannabis use." Dr. Toma believed Peyton's psychotic episodes were substance-induced, not the result of a primary psychotic disorder, but noted Peyton's bipolar disorder was an underlying condition. "Given these factors, it is important to recognize the parallel between [Peyton's] substance use and his violent outbursts, as well as the likelihood that his bipolar symptoms exist independently of substance use, meaning future episodes of mania or depression could still occur even in the absence of drug use. This highlights

the importance of long-term psychiatric care, substance abuse treatment, and mood stabilization strategies to prevent further incidents."

Dr. Toma concluded Peyton's mental illness symptoms would respond to appropriate mental health treatment, and that if Peyton received appropriate treatment in the community, he did not pose an unreasonable risk of danger to public safety. Specifically, Dr. Toma recommended psychotropic medications that could stabilize Peyton's mood and prevent future episodes, along with psychotherapy and substance abuse treatment.

Peyton's motion also included a letter of acceptance into a community reentry program offering substance abuse treatment and mental health services.

The People opposed Peyton's motion on the grounds that Peyton posed an unreasonable risk of danger to the public if he were treated for his mental illness in the community. The People argued that considering the current offense and Peyton's previous psychiatric hold in 2023, "[t]he fact that [Peyton] was armed with a knife in this case and was armed with a machete in the past is concerning and demonstrates that he is impulsive, unpredictable and a serious threat to the safety of the victim, his mother and [his] community."

The trial court held a hearing on Peyton's section 1001.36 motion in August 2025. The court stated it had "read and considered the defendant's motion for mental health diversion, which included the psychological report from Dr. Sherif Toma, a qualified mental health expert. The court has also read and considered the probation report and the treatment plan provided by the department of mental health. The court has also considered the People's opposition." The court found Peyton did

6

have a mental health disorder, but it determined Peyton was not suitable for mental health diversion and denied the motion, reasoning:

> Defendant is charged with attempted murder. In this case, it is alleged the defendant came into his brother's bedroom without warning or provocation and stabbed him.
>
> The defendant has a history of violent behavior towards his family, which has resulted in a psychiatric hold and hospitalization in July 2023. In that case, the defendant slashed his own tires, was acting aggressively, and was running around with a machete and breaking things.
>
> Given his past psychiatric hospitalization, the defendant knew or should have known that he suffers from a mental health illness that causes psychotic episodes. Nevertheless, he continued to abuse drugs, including mushrooms and marijuana, which may have contributed to this incident, as in the opinion of Dr. Toma.
>
> The statute allows the court to consider the defendant's violence, the defendant's criminal history . . . [including] two prior strikes for first degree burglary[,] and the facts and circumstances of the current charge.

Based on those factors, the court finds the defendant is not suitable for mental health diversion as he poses an unreasonable risk of danger to public safety as defined under Penal Code 1170.18(c)[].

Peyton timely appealed from the denial of his motion for diversion.

## C. *Conviction and Sentence*

Pursuant to a plea bargain, Peyton pled guilty to assault with a deadly weapon (§ 245, subd. (a)(1)) and admitted a special allegation of great bodily injury (§ 12022.7, subd. (a)) and one prior strike. Peyton received a total sentence of nine years in prison consisting of the middle term of three years, doubled for the prior strike, plus three years for the great bodily injury enhancement.

## DISCUSSION

## A. *Governing Law and Standard of Review*

"Enacted in 2018, section 1001.36 authorizes pretrial diversion for defendants with qualifying mental disorders." (*People v. Braden* (2023) 14 Cal.5th 791, 801.) "The stated purpose of the diversion statute 'is to promote . . . [i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety . . . [and] [p]rovid[e] diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' " (*People v. Frahs* (2020) 9 Cal.5th 618, 626.)

"At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable." (§ 1001.36, subd. (e).) A defendant is eligible for pretrial diversion if he "has been diagnosed with a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders . . . excluding antisocial personality disorder and pedophilia" and "[t]he defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subds. (b)(1)-(2).) Additionally, the defendant must be "suitable" for pretrial diversion, meaning (1) "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder . . . would respond to mental health treatment"; (2) the defendant consents to diversion and waives his right to a speedy trial; (3) the defendant "agrees to comply with treatment as a condition of diversion"; and (4) "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subds. (c)(1)-(4).)

Section 1170.18 defines an " 'unreasonable risk of danger to public safety' " as " 'an unreasonable risk that the petitioner will commit a new violent felony' " within the meaning of section 667, subdivision (e)(2)(C)(iv). "That clause, in turn, itemizes eight categories of offenses—sexually violent offenses, oral copulation with a child under 14, lewd or lascivious act with a child under 14, homicide, solicitation to commit murder, assault with a machine gun on a peace officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by life imprisonment or death—colloquially referred to as 'super

9

strikes.' " (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149 (*Whitmill*).)  In determining whether a defendant may pose an unreasonable risk of danger to public safety if treated in the community, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (c)(4).)

"If the defendant makes a prima facie showing that he or she meets all the statutory eligibility and suitability criteria, the trial court still has discretion to deny diversion."  (*People v. Tourville* (2026) 120 Cal.App.5th 439, 453; accord, *People v. Cabalar* (2025) 117 Cal.App.5th 41, 53 (*Cabalar*).)  "This residual discretion is not unfettered and must be exercised ' "consistent with the principles and purpose of the governing law." ' " (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 135 (*Vaughn*); accord, *People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 891.)  " 'Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals.' " (*Vaughn*, at p. 135; accord, *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 893 (*Sarmiento*).)

We review for an abuse of discretion the trial court's decision to deny a motion for mental health diversion.  (*Vaughn, supra*, 105 Cal.App.5th at p. 135; *Whitmill, supra*, 86 Cal.App.5th at p. 1147.)  " 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied

10

factual findings that are not supported by substantial evidence.' " (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080 (*Gerson*); accord, *Cabalar, supra,* 117 Cal.App.5th at p. 53.) The appellant bears the burden of establishing an abuse of discretion on appeal. (*People v. Pacheco* (2022) 75 Cal.App.5th 207, 213 (*Pacheco*); accord, *People v. Bunas* (2022) 79 Cal.App.5th 840, 866.)

B.     *The Trial Court Did Not Abuse Its Discretion By Denying Peyton's Motion for Mental Health Diversion*

Peyton argues the trial court abused its discretion in several ways by finding diversion and treatment in the community would pose an unreasonable risk of danger to public safety.[3]

We conclude the court did not abuse its discretion. As an initial matter, the court applied the correct legal standard from section 1001.36, by considering whether Peyton "poses an unreasonable risk of danger to public safety as defined under Penal Code 1170.18(c)[]." As Peyton and the People argued at the hearing, this required a determination of whether there was an unreasonable risk that Peyton was likely to commit a super-strike offense. The court also correctly identified that section 1001.36, subdivision (c)(4), permitted consideration of Peyton's "violence" and "criminal history," as well as "the facts and circumstances of the current charge."

Additionally, the trial court had substantial evidence from which to find that Peyton posed an unreasonable risk of danger to public safety if treated in the community, i.e., that there was an unreasonable risk Peyton would commit a super-strike offense.

---

[3]     Peyton does not raise any argument regarding the other suitability and eligibility criteria in section 1001.36.

11

First, Peyton's current charge of attempted murder was itself a super-strike offense. (See *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679 [attempted murder is a super-strike offense]; accord, *Whitmill*, *supra*, 86 Cal.App.5th at p. 1150; see also *People v. Graham* (2024) 102 Cal.App.5th 787, 790 (*Graham*) [affirming denial of diversion where the charged crimes were super-strike offenses].) Peyton's current offense was violent, involving a deadly weapon and multiple injuries to the victim. (See *People v. Brown* (2024) 101 Cal.App.5th 113, 124 (*Brown*) [affirming denial of diversion on public safety grounds, where defendant "invoked extreme physical violence against a vulnerable victim in response to a relatively minor altercation" and "the trial court could reasonably infer that there was a significant risk that [defendant] could commit an even more serious, violent felony in the future, and therefore posed an unreasonable risk under section 1001.36, subdivision (c)(4)"]; cf. *Sarmiento*, *supra*, 98 Cal.App.5th at p. 897 [no substantial evidence that defendant was likely to commit a super strike offense, where "the charged offense . . . involved no evidence of a weapon or threat of violence"]; *People v. Williams* (2021) 63 Cal.App.5th 990, 1003 [same, where current charges were "not super-strike offenses, he poses a low risk to public safety in the uncontroverted opinion of two mental health professionals, there is no evidence he owned, possessed or had access to any weapons," and defendant had no prior criminal record and "never actually assaulted anyone or engaged in any violence"]; accord, *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 690 [same].)

Beyond the circumstances of the current charges, Peyton's background provided substantial evidence from which to find he posed an unreasonable risk of committing a super-strike offense.

12

As noted by the court, Peyton had two previous strike convictions for first-degree burglary.  Dr. Toma described Peyton's history of bipolar disorder and psychosis since 2023, which led to a mental health crisis and psychiatric hospitalization in July 2023.  As observed by the court, in the July 2023 incident, Peyton had an argument with his mother where he "slashed his own tires, was acting aggressively, and was running around with a machete and breaking things."  As with the circumstances surrounding Peyton's attempted murder charge, Peyton's previous episode of mental illness involving aggressive use of a weapon during an altercation with his family supports an unreasonable likelihood that he could commit a super-strike offense if treated in the community.

Peyton argues that the trial court lacked substantial evidence to find that he was likely to commit a super-strike offense.  Specifically, Peyton argues "[t]he court placed heavy weight on the [current] offense and prior incidents, including [the] 2023 machete-brandishing incident and [psychiatric] hold, while insufficiently weighing or explaining its rejection of Dr. Toma's uncontradicted expert opinion and treatment plan."  Peyton asserts that the court "made no mention whatsoever of Dr. Toma's evaluation and findings that, with appropriate community-based treatment, [Peyton] does not pose an unreasonable risk of danger to public safety."

Peyton does not demonstrate an abuse of discretion on this ground.  " '[T]here is nothing in section 1001.36, with respect to . . . suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion.' " (*Graham, supra*, 102 Cal.App.5th at p. 799 [affirming dangerousness finding];

13

accord, *People v. Bunas*, *supra*, 79 Cal.App.5th at p. 862.) Similarly, section 1001.36 does not "preclude[] a trial court from rendering a dangerousness finding contrary to one expressed by a mental health professional." (*Siam v. Superior Court* (2026) 118 Cal.App.5th 67, 83.) This is because section 1001.36 expressly authorizes the trial court to consider "expansive" criteria in evaluating a dangerousness finding (*Siam*, at p. 83), including the "opinions of the district attorney[] [and] the defense," "the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate" (§ 1001.36, subd. (c)(4)).

While Dr. Toma's report concluded that Peyton could be treated in the community without unreasonable risk of danger to public safety, other considerations before the trial court supported that Peyton was likely to commit a super-strike offense, as discussed. "Although Dr. [Toma's] opinion is evidence that . . . [Peyton] would not continue to pose an unreasonable risk if medicated[, ]it is not the only evidence that the trial court considered. . . . [T]he existence of some evidence in support of either conclusion is not a sufficient basis for this court to supplant the findings of the trial court." (See *Brown*, *supra*, 101 Cal.App.5th at pp. 123-124 [affirming dangerousness finding because "under the applicable standard of review, we may not substitute our own judgment for that of the trial court, and instead must defer to the trial court's weighing of the evidence"]; accord, *Gerson*, *supra*, 80 Cal.App.5th at p. 1086.)

Peyton also asserts the court failed to "consider the statutory factors of § 1001.36" by denying diversion. In Peyton's view, the court erred by finding Peyton "knew or should have

14

known that he suffers from a mental health illness that causes psychotic episodes" and "[n]evertheless . . . continued to abuse drugs . . . which may have contributed to this incident." Peyton contends this reasoning "shifted the focus from statutory suitability and public safety toward moral culpability for relapse" and "fail[ed] to properly consider how [Peyton's] mental health disorders contributed to this pattern of behavior." Peyton submits that his case "presents precisely the circumstances where mental health diversion should be granted under the Legislature's broad remedial intent," i.e., a "cycle of untreated mental illness and substance abuse that the diversion statute was designed to address."[4]

The trial court did not abuse its discretion in this manner. It is true that a "court's assertion that 'addicts relapse[]' . . . cannot, without more, be used to deny a person mental health diversion when one of the diagnoses rendering them eligible for

---

[4] Citing case law on trial courts' residual discretion under section 1001.36, Peyton argues the court was required to exercise its discretion " ' "consistent with the principles and purpose of the governing law." ' " (See *Sarmiento, supra,* 98 Cal.App.5th at p.893 ["Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals."].) But here the court denied diversion on the basis of its finding that Peyton posed an unreasonable risk to public safety, an express statutory suitability criterion, and it did so based on the legal standard and considerations laid out in section 1001.36, subdivision (c)(4). For this reason, the court did not rely on its residual discretion to deny diversion. (See *Vaughn, supra,* 105 Cal.App.5th at p. 135 [discussing residual discretion].)

15

diversion is an alcohol or other substance related disorder." (*Cabalar*, *supra*, 117 Cal.App.5th at p. 57.)  But "[t]he obligation to determine whether a defendant will pose an unreasonable risk of danger to the public if granted diversion necessarily includes determining whether the defendant will abandon treatment. . . ." (*People v. Superior Court (Taylor)* (2026) 118 Cal.App.5th 1153, 1169 (*Taylor*).)

Considering the circumstances presented here, Peyton began experiencing psychotic symptoms in 2023 and was psychiatrically hospitalized in July 2023.  Peyton was prescribed psychiatric medication during this hospitalization, but there is no indication that Peyton was treated or took medication after his hospitalization.  Rather, Dr. Toma attributed Peyton's prior violent behavior to his "untreated mental illness that was exacerbated by his drug use."  Peyton was additionally prescribed antipsychotic medication while incarcerated on the current charges, but he requested that he be given an alternative medication.  Peyton was incarcerated at the time of his interview with Dr. Toma on March 19, 2025, and Dr. Toma noted Peyton was "not receiving any antipsychotic medications in jail and is reportedly doing well."  Dr. Toma believed it was "essential" that Peyton receive "psychotropic medications that can help stabilize his mood and prevent future episodes," including the medications Peyton was prescribed while hospitalized and incarcerated.

Peyton also disclosed a history of using marijuana daily since 2009, ecstasy and painkillers since 2010, mushrooms since 2021, and fentanyl since 2023.  Dr. Toma opined that "cannabis use" contributed to Peyton's 2023 hospitalization, "when he tested positive for THC and was also experiencing significant psychiatric distress."  Peyton continued use of these substances

16

after the 2023 hospitalization, despite acknowledging to Dr. Toma that his drug use "leads to paranoia and auditory hallucination." Dr. Toma opined that Peyton's substance use "appear[s] to have been directly correlated" with his psychotic symptoms, "his violent behavior may have stemmed from a combination of cannabis-induced paranoia and irritability," and treatment must entail "long-term abstinence from cannabis and other psychoactive substances." "Without proper intervention," Dr. Toma believed "there is a high likelihood that [Peyton's] symptoms will return, potentially leading to future psychiatric hospitalizations, legal issues, or further deterioration in his mental health." Dr. Toma also stated that "continued clinical intervention and maintenance of psychiatric symptom stabilization could prevent possible future violen[ce] and accompanying victimization of others."

The trial court did not abuse its discretion by determining these circumstances did not support diversion in light of Peyton's history of untreated mental illness and drug use that caused him to engage in violent behavior, even after he had been hospitalized and prescribed antipsychotic medication.[5] (See *Pacheco, supra*, 75 Cal.App.5th at pp. 213-214 [affirming denial of diversion on public safety grounds, given mental health expert's opinion that defendant needed to abstain from drug use which exacerbated his psychotic symptoms, and defendant's long history of drug use despite previous incidents]; cf. *Taylor, supra*, 118 Cal.App.5th at pp. 1168-1169 [reversing grant of diversion where "the record supports a reasonable inference that [defendant] would abandon

---

[5] In light of our holding the trial court did not abuse its discretion, we need not address Peyton's remaining contention that the court's decision was prejudicial.

17

aspects of the mental health regimen experts testified were crucial for him not to pose an unreasonable danger to the public, with potentially catastrophic consequences," because he previously "failed to take his medications," and "no substantial evidence support[ed] the court's implied finding that [defendant] was suitable for mental health diversion"]; *Whitmill*, *supra*, 86 Cal.App.5th at pp. 1151-1152 [no substantial evidence that defendant would not "abstain from substance abuse such that he won't commit a super strike," because defendant relapsed due to a family member's cancer diagnosis, found past substance abuse treatment to be helpful, and was very willing to participate in future treatment].)

## DISPOSITION

The judgment is affirmed.

MARTINEZ, P. J.

We concur:

FEUER, J.

STONE, J.

18